UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNDERDOG TRUCKING, L.L.C., and
REGGIE ANDERS,

                  Plaintiffs,

-against-

CELLCO PARTNERSHIP d/b/a VERIZON
WIRELESS, OSCAR APONTE, MATT
CHAPPELL, DOES 1 through 19, ABC
INSURANCE COMPANY, DEF
INSURANCE COMPANY and XYZ
INSURANCE COMPANY,

                  Defendants.

10 CV 9189 (DLC)
ECF Case

## PLAINTIFF'S RULE 56.1 STATEMENT

Pursuant to Local Civil Rule 56.1 Plaintiff **UNDERDOG TRUCKING, L.L.C., and REGGIE ANDERS,** (referred to herein as "Plaintiff" or "Underdog") sets forth below material facts as to which there are genuine issues to be tried. This statement is supported by the appended

The Declaration of Japheth N. Matemu ("Matemu Decl.") as Exhibit 1. Relevant transcript pages from the depositions of the following individuals are attached as exhibits to the Matemu Decl. as follows: (i) Albert Harris, dated December 9 ,2011 ("Harris. Tr.") (Matemu Decl. Ex. 1); (ii) Anthony Kelley, dated December 9 ,2011 ("Kelley Tr.") (Matemu Decl. Ex. 2); (iii) Bobby Hamlett dated December 9 ,2011("Bobby Tr.") (Matemu Decl. Ex. 3).

### A. BACKGROUND REGARDING THE PLAINTIFF.

1. Plaintiff admits paragraph 1 of part A of Defendant's Rule 56.1 Statement.

2. Plaintiff admits paragraph 2 of part A of Defendant's Rule 56.1 Statement.

3. Plaintiff admits paragraph 3 of part A of Defendant's Rule 56.1 Statement.

4. Plaintiff admits paragraph 4of part A of Defendant's Rule 56.1 Statement.

5. Plaintiff admits paragraph 5 of part A of Defendant's Rule 56.1 Statement.

6. Plaintiff admits paragraph 6 of part A of Defendant's Rule 56.1 Statement.

7. Plaintiff admits paragraph 7 of part A of Defendant's Rule 56.1 Statement.

**B. THE AGREEMENT**

8. Plaintiff admits paragraph 8 of part B of Defendant's Rule 56.1 Statement.

9. Plaintiff admits paragraph 9 of part B of Defendant's Rule 56.1 Statement.

10. Plaintiff maintains that the general services agreement (Hammond Dcl.Ex. 16) was an actual contract setting forth contractual rights and obligations between the Plaintiff and the Defendant giving the plaintiff the right to contract with the defendant on terms fixed by the contract.

    The contract was not non-exclusive in its nature because it gave the Defendant ONLY two options:

    a) Engage and pay Underdog on the basis of the agreed rates appended to the agreement as Exhibit A (Pl.Tr. 28-29; Berry Tr. 10,13-14; Hammond Decl.Ex. 15,16.) or,

    b) Solicit an offer or proposal to perform services on a competitive bid or quotation basis.

In each of those two scenarios the plaintiff had to be involved in the purchase order by either providing the services as per the rates provided in the contract or compete in good faith with a competitor in an open and fair bidding process. There is no provision in the contract to completely ignore the plaintiff and assign work to a competitor without the plaintiff's knowledge or input. The contract does not permit

the defendant to issue trucking service contracts to other service providers by use of sham bidding processes or by misinforming or withholding material bidding information from the Plaintiff. (Hammond Decl.Ex 16. Part 6.1 and 6.2).Sham bidding, failure to use competitive bidding, and failure to pay for services at the contract prices is a breach of contract.

11. Plaintiff admits paragraph 11 of part B of Defendant's Rule 56.1 Statement.
12. Plaintiff admits paragraph 12 of part B of Defendant's Rule 56.1 Statement.
13. Plaintiff admits paragraph 13 of part B of Defendant's Rule 56.1 Statement.
14. Plaintiff admits paragraph 14 of part B of Defendant's Rule 56.1 Statement except the statement that the contract was non-exlusive.
15. Plaintiff admits paragraph 15 of part B of Defendant's Rule 56.1 Statement.
16. Plaintiff admits paragraph 16 of part B of Defendant's Rule 56.1 Statement.
17. Plaintiff admits paragraph 17 of part B of Defendant's Rule 56.1 Statement.
18. Plaintiff Denies that the contract contemplated that the defendant would order no services under the contract (Harris Tr.xxx)
19. Plaintiff admits paragraph 19 of part B of Defendant's Rule 56.1 Statement.
20. Plaintiff admits that the contract permitted Underdog to unilaterally lower prices but **DISPUTES** Counsels presumptions injected into the statement as to the reasons why. The contract does not say why Underdog was permitted to unilaterally offer lower rates. Neither did the contract permit the Defendant to coerce the Plaintiff to offer rates lower than the agreed rates except in the context of a good faith bidding process.
21. Plaintiff admits paragraph 21 of part B of Defendant's Rule 56.1 Statement.

22. Plaintiff admits paragraph 22 of part B of Defendant's Rule 56.1 Statement.

23. Plaintiff **DISPUTES** paragraph 23 in that the contract (Hammond Decl. Ex. 16 part 6.1) mandates defendant to pay the rates set out in Exhibit A of the contract. The contract does not give defendant the option to unilaterally decide to pay any lower prices except in the event of a competitive bid.

24. Plaintiff admits paragraph 24 of part B of Defendant's Rule 56.1 Statement.

25. Plaintiff maintains that defendant is liable for all losses directly arising out of breach of the contract.

26. Plaintiff admits paragraph 26 of part B of Defendant's Rule 56.1 Statement.

## C. UT'S PERFORMANCE OF THE AGREEMENT

27. Plaintiff admits paragraph 27 of part C of Defendant's Rule 56.1 Statement.

28. Plaintiff admits paragraph 28 of part C of Defendant's Rule 56.1 Statement.

29. Plaintiff admits paragraph 29 of part C of Defendant's Rule 56.1 Statement.

30. Plaintiff admits paragraph 30 of part C of Defendant's Rule 56.1 Statement.

31. Plaintiff **DISPUTES** bills were promptly paid. In an effort to run Underdog out of business, Mathew Chappel and Oscar Aponte began delaying payments for nearly two months and Reggie Anders had to literally beg for payments time after time. (Matemu Decl. A)

32. Plaintiff admits paragraph 32 of part C of Defendant's Rule 56.1 Statement.

33. Plaintiff admits paragraph 33 of part C of Defendant's Rule 56.1 Statement.

34. Plaintiff has no information to address the claims in paragraph 34.

35. Plaintiff has no knowledge about the claim in paragraph 35.

36. Plaintiff has no sufficient knowledge to address paragraph 36.

**D. BC LOGISTICS**

37. Plaintiff admits paragraph 37 of part C of Defendant's Rule 56.1 Statement.

38. Plaintiff **DISPUTES** the content of paragraph 38 in that it completely mischaracterizes the events that led to the agreement between the Defendant and BC logistics. What actually occurred is that Vicki Boisjolie, Owner of BC logistics was pushed in by Michael Hoffman and Matt Chappell over the objections of Anthony Kelly, who was running the warehouse at the time. Michael Cary simply did Michael Hoffman's bidding. Underdog was more than an adequate carrier and it came as a surprise that another carrier was being brought in. (Kelley Tr. 19).

39. Plaintiff admits paragraph 39 of part C of Defendant's Rule 56.1 Statement.

40. Plaintiff admits paragraph 40 of part C of Defendant's Rule 56.1 Statement.

41. It is not true that Boisjolie would just knock doors and offer her services, she was waked in by Michael Hoffmann.(Hoffman Tr. 20).

42. Plaintiff **DISPUTES** Paragraph 42 as a complete mischaracterization of what really occurred. Boisjolie did not meet Michael Hoffmann by chance at the Defendant's warehouse, she was walked in by Michael Hoffmann who demanded that she be given work in place of Underdog and she knew Michael Hoffmann before.(Kelley Tr. 33).

43. Plaintiff admits paragraph 43 of part C of Defendant's Rule 56.1 Statement.

44. Plaintiff **DISPUTES** and maintains that Underdog was called in only when BC

logistics had no capacity to perform a piece of work. (Bobby Tr. 27).

45. Plaintiff **DISPUTES** and denies that BC logistics rates were lower than those of Underdog. As a matter of fact they were the same and sometimes higher and BC logistics benefitted from the sheer volume of work it received while Underdog had been pushed out of business.(Matemu Decl. B).

46. Plaintiff denies that trucking services were distributed equally between Underdog and BC logistics. (Matemu Decl. B).

47. Underdog is identified by the Contract as the primary supplier and charged with the responsibility as the primary supplier, to comply with certain federal regulations. Underdog was the primary carrier for all intends and purposes and was known and treated as such. (Hammond Decl. Ex. 16 p. 3 ¶ 7.2.)

48. Plaintiff **DISPUTES**. Though other trucking companies performed services for Defendant, it was not the type of services Underdog had been performing. Those other trucking services were the type of UPS and FEDEX for small packages to the airport and such. Not heavy hauling carries of the type of Underdog. Underdog had exclusivity in heavy and long distance trucking.(Kelly Tr. 12).

E. UT'S BILLING PRACTICES

49. Plaintiff wishes to put the invoices issue into context to avoid perpetrating the wrong impression. They were ONLY TWO invoices that needed explanation based on the scope of work for which they were submitted. They were questioned by employees who had no understanding of the bills, had no role in billing and had no basis to conclude that the bills were unreasonable. These bills were found

to be valid and paid. (Hoffman Tr. 15-16).(Hammond Decl. Ex 22; Cassidy Tr. 23).

50. Plaintiff has no information regarding paragraph 50 of part C of Defendant's Rule 56.1 Statement.

51. Plaintiff **DISPUTES** paragraph 51 of part E of Defendant's Rule 56.1 that he contravened the contract and adds that the contract gave plaintiff unilateral flexibility in the setting lower billing rates.(Hammond Decl. Ex. 16 part 6.3).

52. Plaintiff **DISPUTES** these calculations contravened the contract. The questioning of those bills had nothing to do with the amount, but Carey just wanted them to be clearly itemized instead of aggregating. The contract allowed Underdog the flexibility to charge lower rates.

53. Plaintiff **DISPUTES** and states that the questions prior managers had asked were not in the context of the bills being high but in the normal course of accounting. (Pl.Tr.54, 170).

54. Plaintiff **DISPUTES**. A reasonable reading of (Pl. Tr. 70) clearly shows that Reggie Anders was asked to describe the first meeting with Oscar Aponte. He described it as a friendly introduction. Certainly Reggie Anders does not suggest that the relationship remained friendly past that introduction. As a matter of fact, it deteriorated very soon after. They did not establish a friendly professional relationship.

**F. UT'S DECEMBER 2008 INVOICES**

55. Joe Cassidy was entitled to his own opinion, informed or not, regarding those bills.

56. Plaintiff admits paragraph 56 of part E of Defendant's Rule 56.1 Statement.

57. Plaintiff **DISPUTES** .Cassidy expressed no basis upon which to conclude that the bills were excessive. They just appeared so to Cassidy. Michael Hoffmann advised the defendant that those bills were reasonable and could have been higher. Billing could vary wildly depending on the scope of work. (Hoffman Tr. 18). The issue here is whether the bills were actually excessive or not and whether they were simply a pretext to run underdog out of business.

58. Plaintiff **DISPUTES** .Aponte and Chappell never had any involvement with shipper's bills. That was not their role in the warehouse and they would never be able to form an opinion about whether any bill was excessive or not. Defendant states in the corresponding paragraph that Reggie Anders sent them straight to Cassidy. The involvement of Chappell and Aponte with those bills was part of developing a conspiracy motivated by racial discrimination to paint Underdog in bad light and justify underdog expulsion from shipping for the defendant. (Kelly Tr. 27).

59. Plaintiff **DISPUTES** .Stevenson similarly had no basis to conclude that the bills were excessive. He had admittedly never looked at the contract. (Stevenson Tr. 14, 17).

60. Plaintiff cannot agree or disagree about the truth or otherwise of paragraph 61.

61. It is not true that Stevenson never had any contact with Anders. Stevenson had met Anders several times and knew who he was because he was the main shipper for the Defendant.

62. Plaintiff admits paragraph 63 of part E of Defendant's Rule 56.1 Statement.

63. Plaintiff **DISPUTES**. The defendant here mischaracterizes Mr. Hoffmann's stated opinion. Mr. Hoffmann having reviewed the bills clearly stated that the bills were reasonable and in fact said that the range for such work would have been between $70,000 and $106,000. Hoffmann's Opinion is important because unlike Stansberry, Stevenson, Aponte and Chappell, he had run the warehouse for ten years and knew the just about everything about shipping and warehousing. That is the reason they sought his opinion. And he responded that the bills were reasonable.(Pl. Tr. 81).

64. Hoffman Stated that the invoices in question were fair.(Hoffman Tr.18).

65. Plaintiff **DISPUTES**. The 'Informal conversations' referred to in paragraph 66 actually were the perpetration and execution of a conspiracy motivated by racial discrimination with the objective of running underdog out of business and replacing them with BC logistics, a white owned company. (Kelly Tr. 25, 26, 27).

66. Plaintiff **DISPUTES**. The reason why Aponte had no 'specific basis' for refusing payment was that the invoices were fair and reasonable and supported by Exhibit A of the contract.

67. Plaintiff admits paragraph 68 of part E of Defendant's Rule 56.1 Statement.

68. Plaintiff admits paragraph 69 of part E of Defendant's Rule 56.1 Statement.

69. Plaintiff cannot verify paragraph 70.

G. VZW REQUESTS BIDS

70. Plaintiff **DISPUTES**. Paragraph 71 is unsupported by the evidence proferred

and does not advance the defendants conclusory statement. Winter is not a slow period.In fact plaintiff's invoices for January, February and March 2008 show that plaintiff made the following amounts from shipping from Verizon:January 2008 -$20,656.25, February 2008 -$63,116.45 ,March 2008- $51,137.15. (Matemu Decl. C)

71. Plaintiff **DISPUTES** .In February and March defendant continued to give shipping secretly to BC logistics without subjecting it to bidding in violation of the contract with underdog. Those three bids for a period of three months in a busy warehouse attest to the fact that the bidding process was nothing but a sham and a pretext to perpetuate racial discrimination against underdog. It is unthinkable that in a regional warehouse serving the whole southwest region, there were only three trucking jobs in two months. Regardless of the season.(Matemu Decl. Ex.C).

72. Plaintiff **DISPUTES** .Defendant's paragraph 72 is further evidence that the bidding process was all but a complete sham. The apparent lack of records simply would mean that no actual bids were generated and there is no explanation why only three bid records are available.

73. Plaintiff **DISPUTES** .The bid that somehow could be located is one where there is disparity in the amounts and there is no explanation about what the bid was for and the scope of work and whether or not such work was actually performed. Looking at the exhibited bids, they are for two different loads, to two different destinations in Nevada, generated by two different employees, so the bids cannot be compared.(Hammond Decl. Exs. 25,26).

74. Plaintiff **DISPUTES** .There is no evidence to support this self serving statement to the effect that Aponte instructed Chappell to provide the exact same information to both UT and BC logistics to use in preparing these bids. No records exist to show that the same information was supplied to both UT and BC logistics or any verifiable instruction communicated to Chappell. There is contrary evidence (Hammond Decl. Exs. 25,26).

75. Plaintiff **DISPUTES** .The two bids exhibited here (Hammond Decl.Ex 25 and Ex.26) are actually proof that different information was provided for the same bid to UT and BC logistics respectively and not for the exact same jobs as stated. First, the destinations are different, The UT bid says Henderson, NV and the BC Logistics Bid says Las Vegas, NV. Secondly, The UT bid is addressed to Joe Cassidy while the BC logistics one is to Matt Chappell. Thirdly, the BC logistics bid says 'electrical equipment' while the UT bid says 39 skids. It is quite clear that either these are different bids or different information was provided for the same bid or a conspiracy was brewing. The plaintiff is actually right to say different information was provided rendering the results of the bidding patently unfair. The issue is if there was actual competitive bidding or it was just a pretext for more sinister objectives.

76. Plaintiff **DISPUTES** Aponte did not call Anders on his own volition after seeing the disparity in the bids. Anders actually went to see Aponte to ask what was going on with these bids and why the process was being run in bad faith. (Pl. Tr. 96, 97; Bobby Tr. 34,35).

77. Plaintiff **DISPUTES** .Looking at Reggie Anders' deposition from page 83 to 85, there was nothing friendly between Aponte and Anders to the extent that Aponte

would be trying to help Anders get more work.(Pl.Tr.83-85; Bobby Tr. 34,35).
The defendant is mischaracterizing the actual relationship between Aponte and Anders by trying to imply that Aponte was giving friendly 'advice'. As a matter of fact Aponte told Anders 'I don't care anything about your contract'. (Pl.Tr. 85).

78. Plaintiff **DISPUTES** .Aponte was coercing Anders to accept 75% reduction in the agreed rates and to change the pricing but Anders elected to stay with the contract rates already negotiated and agreed upon.

79. The contract allowed Underdog to Unilaterally discount any rates if it so wished, but it could not be forced to do so except in the context of competitive bidding.

80. Plaintiff **DISPUTES** .Chappell only called underdog for the jobs that BC logistics was not equipped to perform and had no capacity to perform. Otherwise all the jobs went to BC logistics. (Bobby Tr. 27)

## H. ALLEGED COMMENTS

81. Reggie Anders stands by his statement under oath as an accurate recollection of what occurred in may 2009 regarding the racial slurs uttered by Aponte.(Pl Tr. 109-10).

82. Plaintiff **DISPUTES** .Racial slurs and animosity was always present in the warehouse.(Harris Tr. 39,40,41,42)

83. Anders indeed reported the incident and asserts that such epithets were used.

84. Aponte admits having said that an individual 'could take it a little bit as threatening'.

95. Plaintiff **DISPUTES** The reference to (Pl.Tr.205) does not support this paragraph.

96. Plaintiff **DISPUTES** .Those supposed inaccuracies are on details that are not material to the claim and Anders promptly corrected them. These were harmless errors.

97. Plaintiff **DISPUTES** .This is a complete mischaracterization of the answer to a question that Anders did not understand. A simple reading of the referenced excerpt shows. He simply did not hear or understand the question and asks for the question to be repeated. He was not prodded at all. The rest of the referenced excerpt does not support the defendants claim in paragraph 98.

98. Plaintiff **DISPUTES** .Cary is accused of racism as an agent of the Defendant in the complaint and in Plaintiff's deposition as being a co-conspirator in racially motivated acts to interfere with the plaintiff's contract.

99. Plaintiff **DISPUTES** .Cassidy is accused as a co-conspirator in the same acts of racial discrimination.

## I. CONCLUSION OF THE RELATIONSHIP

100. Plaintiff **DISPUTES** .When defendant stopped giving work to underdog, Anders could form the opinion that defendant had constructively terminated the contract.

101. Plaintiff **DISPUTES** .Anders did not win a single bid. It was clear to him that

that he was wasting time every time he involved himself in a bid because he knew that the bidding was all a complete sham and it was never intended to be fair. He knew Chappell only called him on the rare occasion that BC logistics had no capacity to carry perform a service. Any reasonable person would have been deeply frustrated by such an event.

102. Defendant did in fact stop giving work to Underdog as a matter of stated policy and work that was supposed to be given to underdog was either withheld by Aponte and Chappell or diverted to BC logistics.(Bobby Tr. 17).

103. Plaintiff **DISPUTES** .Plaintiff agrees with paragraph 104 but only to the extent that work for Plaintiff had completely dried up and he was offered one or two loads which did not change the fact that Anders and Underdog were victims of racial discrimination.

104. Underdog, a corporation, suffered damage to its credit rating just as an individual could.

Dated: Raleigh, NC
February 7, 2012

Respectfully Submitted,

MATEMU LAW OFFICE P.C

_____
Japheth Nthautha Matemu
5540 Centerview Drive, suite 200
Raleigh, NC 27606
(919) 424 6332

Attorneys for the Plaintiff
**UNDERDOG TRUCKING, L.L.C.,
And REGGIE ANDERS**