UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNDERDOG TRUCKING, L.L.C., and
REGGIE ANDERS,

                Plaintiffs,

-against-

CELLCO PARTNERSHIP d/b/a VERIZON
WIRELESS, OSCAR APONTE, MATT
CHAPPELL, DOES 1 through 19, ABC
INSURANCE COMPANY, DEF
INSURANCE COMPANY and XYZ
INSURANCE COMPANY,

                Defendants.

10 CV 9189 (DLC)
ECF Case

DECLARATION OF REGGIE ANDERS

---

## DECLARATION OF REGGIE ANDERS

REGGIE ANDERS, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am an African American and owner of Underdog Trucking L.L.C.

2. I am fully familiar with the facts set forth herein and submit this Declaration in opposition to Defendant Cellco Partnership d/b/a Verizon Wireless's ("VZW") Motion for Summary Judgment.

3. On August 30th, 2006, I was approved as a Defendant's (Verizon) vendor with a trial run limit of $25,000. Verizon was having problems with Accurate shipping company.

4. After a satisfactory completion of the trial run, a contract request was made by Eric Berry for Underdog to be engaged on a full contract basis.

5. Underdog limit was raised to $100,000 on 10/31/2006.

6. Underdog could not start work as until approved as a vendor and entered into the Verizon system.

7. Underdog was put on a probationary period for eight months between august 2006 to march 2007 when Verizon felt comfortable enough to sign a contract with Underdog.

8. On march 26th, 2007 the contract was signed between Underdog and Verizon making Underdog the primary Shipper for Verizon.

9. Before Verizon could enter into a contract with Underdog, Verizon demanded that Underdog must own certain equipment to demonstrate capacity to perform the contract. The minimum equipment required was:

    a) 24' Box Trailer with lift gate
    b) 48' Box Trailer with lift gate

      c) 1 Semi for Hauling
      d) 1 Drop Deck Trailer
      e) Equipment Dollies
      f) Pallet Jacks
      g) Load Bars
      h) Chains and Binders
      i) Flags and D.O.T Safety Placards
      j) Moving Blankets

10. I went out of my way and with great difficulty, extensive borrowing and extraordinary effort obtained the required equipment.
11. When I showed that I had the required equipment, the contract was finally approved and I was made the primary shipper for Verizon in the south west region.
12. I negotiated the contract, rates and scope of work with Verizon and as the contract shows on page 3 section 7.2, I was designated as the primary supplier and agreed to comply with certain federal regulations in that capacity.
13. That the contract provided clearly on page 2 section 6.2 that since I was the primary shipper, Verizon had only two choices in the issuing of purchase orders:
    a) Verizon shall pay Supplier (Underdog) the amounts set forth in Exhibit A, or,
    b) Verizon could solicit an offer or proposal to perform services on a competitive bid or quotation basis.
14. In my understanding of the contract, the contract did not permit Verizon to give work to any competitor without submitting the work for competitive bidding, and giving me an opportunity to compete in the bidding process as well.
15. My reading of the contract was that, Verizon could not just pick a shipper of the street and give them shipping work without submitting the work to a bidding or quotation process or just assign work to any competitor without my involvement in a legitimate competitive bidding or quotation process.
16. Any action of the defendant not in compliance with section 6.2 of the contract would be a breach of the contract.
17. Verizon was in breach of contract for assigning work to BC logistics without submitting it to competitive bidding.
18. The contract in my view would be meaningless and of no purpose whatsoever if Verizon could assign work to any contractor at any time and at any rate. The contract had a negotiated purpose and the purpose was to make me the primary shipper and give an option to Verizon to issue orders by way of competitive bidding or quotation if the need arose.
19. During the entire period I was a shipper for Verizon from 2006 to 2009, only two bills were ever questioned and they were found to be completely compliant with the contract and paid.
20. The bills were reasonable and I was told that Michael Hoffmann, who had worked for many Years as the warehouse manager, and who was regularly consulted on such matters, advised Verizon that the bills were reasonable and could have even been higher.
21. In my experience with Verizon, Verizon could never pay a dime that was not supported by the contract or strictly accounted for because they could very easily refuse to pay such an excessive bill.
22. As a matter of fact, the contract provides on page 3 section 7.1 that Verizon reserved the right to audit any bill and if found to be excessive, require a full reimbursement at any time.
23. Verizon did not exercise this option but instead its officers used the pretext of a high bill to develop a racially motivated plot to get rid of me and replace me with a white person.

24. The contract did not give Verizon the option to unilaterally lower the prices agreed to in Exhibit A. The language in section 6.1 of the contract uses the mandatory language "...shall pay...".only underdog had the option to offer lower prices.
25. Shortly after this billing fiasco, a sham bidding process started aimed at getting rid of Underdog.
26. During the next four months or so, only three bids were ever communicated to me all won by BC logistics.
27. I had shipped for Verizon for over two years and there was no way the warehouse, serving the whole south west region of the United States, could have only three shipping jobs for a period of four months.
28. The reason in my view is that Verizon engaged in this sham bidding process in order to attempt to comply with the contract and avoid a claim for breach of contract.
29. Verizon withheld pertinent information from Underdog when requesting bids for example, failed to inform underdog that there was a return load after a delivery in which case Underdog would have bided at half the rate or less on account of the return load.
30. Verizon would give information about the return load to BC logistics therefore BC logistics would outbid Underdog.
31. If the contract was useless as Verizon claims, then I did not understand why they bothered themselves with the sham bidding. They could have simply given the work away without a second thought.
32. Verizon in violation of the contract section 7.1 failed to keep the records of payments of the bids, or an alternative explanation would be that there were actually no bids generated during the period except the three bids acknowledged.
33. Verizon started delaying payment of invoices over long periods of time in the process putting the Plaintiff through serious financial losses and impacting negatively on the ability of plaintiff to do business.
34. Trucking requests addressed to Underdog were diverted to BC logistics.
35. The only time Underdog was called for a trucking order was when BC logistics could not come up with the required equipment or had no capacity to fill an order.
36. I and my assistants kept calling and emailing day after day to beg for underdog invoices to get paid but the defendants kept delaying them for up to fifty days.
37. These delayed payments were not disputed or questioned at any time by the defendant.
38. Some invoices are unpaid until today. Attorneys for the Defendant attempted to pay these invoices on 12/21/2011 but I rejected the payments because they did not take into account the 2 year delay and the other claims I have against the defendant.
39. Oscar Aponte was forcing me to cut my rates by 65 to 75% and told me that he cared nothing about the contract.
40. I showed Aponte sections 6.1 and 6.5 of the contract which mandated payments to be made only as set out under Exhibit A of the contract.
41. Aponte had no authority to modify the contract to rates lower than those Verizon had expressly agreed to pay and in fact used mandatory language to establish.
42. I had several conversations with Aponte to try to resolve any differences since I had become very desperate for work but Aponte was just focused on getting me out of business and at one point said he would ban me from coming to the Verizon premises.
43. I am surprised by Vicki Boisjolie's statement saying that she just came around Verizon warehouse and started knocking doors soliciting for work.
44. The Verizon warehouse is a very secure area where extremely expensive and sensitive equipment is stored. There are many layers of human, physical and electronic security to

make sure that only people previously cleared or people with special permission can access the warehouse.
45. Any one accessing the warehouse who is not an employee or contractor had to have prior permission or had to be walked in by permission of the management.
46. Vicki Boisjolie's statements in this regard are totally untrue. I know that because I shipped from the ware house in question for more than two years.
47. Aponte called me a 'token Nigger' and I reported this to Al Stansberry but nothing came of it.
48. Stansberry told me that Aponte had referred to me as a big black guy and that he felt threatened by me.
49. Each and every of my statements about racial epithets, bad treatment, disparate treatment, and racial discrimination made in the complaint, in depositions and in this declaration are entirely true.
50. Due to racial animus perpetrated by the defendants, and the breach of contract claimed, underdog suffered serious loss and damage and I am entitled to damages as a result

I declare under penalty of perjury that the foregoing is true and correct.
Executed on: January 20, 2012 at Tempe, Arizona

_____  2-8-12
Reggie Anders