```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNDERDOG TRUCKING, L.L.C.,              :
                Plaintiff,              :
           -v-                          :    10 Civ. 9189 (DLC)
                                        :
CELLCO PARTNERSHIP d/b/a VERIZON        :    OPINION & ORDER
WIRELESS,                               :
                Defendant.              :
                                        :
---------------------------------------- X
```

APPEARANCES:

For the plaintiff:
Japeth N. Matemu
Matemu Law Office P.C.
5540 Centerview Drive
Suite 200
Raleigh, North Carolina 27606

For defendant:
Raymond G. McGuire
Kristina C. Hammond
950 Third Avenue
Fourteenth Floor
New York, New York 10022


DENISE COTE, District Judge:

On January 20, 2012, defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon") moved for summary judgment with respect to Underdog Trucking's ("Underdog") claims of breach of contract and race discrimination in violation of 42 U.S.C. § 1981. For the reasons that follow, defendant's motion is granted.

BACKGROUND

The following facts are undisputed, unless otherwise noted. Underdog is engaged in the freight and shipping industry in Arizona. Reggie Anders ("Anders") and his wife, both of whom are African American, own Underdog. Verizon is a cellular telecommunications company.

In September 2006, Verizon began hiring Underdog to deliver telecommunications equipment from a Verizon distribution center in Tempe, Arizona to various cell tower sites throughout the Southwest. Initially, these jobs were performed on an "open account" basis and were not governed by a formal, written term sheet. From April 3, 2007, however, the shipments were governed by a document titled "General Services Agreement Between Verizon Services Corp. and Underdog Trucking LLC" (the "2007 Agreement" or the "Agreement"). The Agreement, the terms of which are discussed in greater detail below, was drafted and signed by Verizon Services Corp., which is a purchasing agent for various Verizon entities. The Agreement was for a term of one year, but contained an automatic renewal provision. It was renewed automatically on April 3, 2008, and April 3, 2009.[1]

Soon after signing the Agreement with Underdog, Verizon "tapered off" its use of two other trucking companies that had

---

[1] The Agreement contains a choice-of-law provision selecting New York law and a forum selection clause that requires any suit arising out of the Agreement to be brought in a New York court.

previously provided similar services. In November 2007, however, Verizon began assigning jobs to BC Logistics ("BC"), a rival shipping company owned by Vicki Boisjolie. Unlike Underdog, which owned most of its own equipment, BC was primarily a forwarder, meaning it subcontracted the majority of its deliveries to other carriers. In November 2007, Verizon entered into a carriage agreement with BC similar to its Agreement with Underdog (the "BC Agreement"). By mid-2008, the trucking work for the Tempe distribution center was equally divided between Underdog and BC.

Underdog made deliveries for Verizon for nearly two years without incident. In mid-2008, however, Michael Carey, who managed the distribution center and Matthew Chappell, a Verizon employee who often prepared bills of lading for the shipments that Underdog carried, questioned the charges on several invoices. On September 2, 2008, Carey sent an e-mail to Underdog inquiring about certain of these charges. Shortly thereafter, Carey was replaced by Oscar Aponte, who paid these invoices after some initial inquiries.

In late 2008, Joe Cassidy, a Verizon employee who was responsible for invoice processing, received two invoices (the "November/December invoices") from Underdog that he described as "the most expensive freight bill that [he had] seen in that role." The invoices struck Cassidy as excessive for the work

performed, so he sent them to Oscar Aponte, the manager of the facility, for review. Aponte showed the invoices to Matthew Chappell, who prepared the bills of lading for shipments carried by Underdog. Both Aponte and Chappell agreed with Cassidy that the bills appeared excessive.

Aponte shared the December invoices with his manager, Marcus Stevenson. Stevenson agreed that the charges seemed high and directed Aponte to begin soliciting bids for all future trucking jobs. But because Verizon had no specific basis for refusing payment of the November/December invoices, Aponte paid them on January 7, 2009.

In early 2009, Verizon opened three jobs to bidding by Underdog and BC. In each case, BC's bid was significantly lower than Underdog's. On February 19, 2009, for example, Underdog bid $8,114.40 to transport 39 skids from the Tempe distribution center to Las Vegas. BC's bid for the same work was $1,890.[2] Unsurprisingly, BC was awarded each of the three jobs.

Through the spring of 2009, Verizon occasionally used Underdog for delivery jobs that needed to be done on a rush basis and thus could not be bid out. The other work went to BC.

---

[2] Although plaintiff disputes that the two bids are for the same shipment, no reasonable jury could find otherwise. Both estimates are dated February 19, 2009 and provide for the delivery of 39 pieces weighing a total of 8000 lbs. from the distribution facility in Tempe, Arizona to Henderson, NV, a suburb of Las Vegas.

4

In May 2009, when Verizon questioned a bill for one of the few jobs that Underdog performed for the company in 2009, Anders brought a copy of the April 2007 Agreement to a meeting with Aponte. Anders says that when he showed Aponte the trucking rates that were specified in the Agreement, the latter replied, "I don't care about your contract, token nigger." Aponte denies making the remark or ever using the word "nigger."

The relationship between Underdog and Verizon continued to sour and, by late-May 2009, Anders was no longer responding to bid requests by Verizon. Soon thereafter Underdog filed a claim with the Equal Employment Opportunity Commission ("EEOC"). On June 8, 2009, the EEOC issued a right to sue letter.

## PROCEDURAL HISTORY

On October 21, 2009, Underdog and Anders filed suit against Verizon Services Corporation ("VSC"), Verizon Communications Inc. ("VCI"), Aponte, Chappell, and various unidentified defendants asserting claims of racial discrimination in violation of 42 U.S.C. § 1981, breach of contract, libel and slander (the "2009 Action"). In an Opinion of July 20, 2010, the Court dismissed the claims against the individual defendants for lack of personal jurisdiction and dismissed several claims against the VSC and VCI on various other grounds. See Underdog Trucking, LLC & Anders v. Verizon Services Corp., et al., No. 09

5

Civ. 8918 (DLC), 2010 WL 2900048 (S.D.N.Y. July 20, 2010) (the "July 20 Opinion").

Following the July 20 Opinion, the remaining claims in the 2009 Action were those of Anders and Underdog that VSC and VCI had interfered with their contract rights in violation of § 1981 and Underdog's breach of contract claim against VSC. On May 4, 2011, the Court dismissed Underdog's remaining claims against VSC and VCI pursuant to Pridgen v. Andresen, 113 F.3d 391, 393 (2d Cir. 1997) (holding that only a natural person may proceed in an action pro se; a corporation must be represented by an attorney in federal court). On November 18, a motion by VSC and VCI for summary judgment on Anders' remaining § 1981 claim was granted because, as noted above, "only a party with rights under a contract may bring a § 1981 claim for improper discriminatory interference with that contract." Domino's Pizza v. McDonald, 546 U.S. 470, 476-77 (2006).

Meanwhile, on December 8, 2010, just after the close of fact discovery in the 2009 Action, Underdog and Anders filed this lawsuit (the "2010 Action"), bringing many of the same claims, but naming Cellco/Verizon in the place of the VSC and VCI. An amended complaint was filed on February 18, 2011. Verizon's motion to dismiss that amended complaint was granted in part in an Order dated June 14 and denied in part in an Order dated July 1. The June 14 Order dismissed all of the claims

brought by Anders, noting that, as a non-party to the Agreement, he lacked standing to assert breach-of-contract or § 1981 claims.  See Domino's Pizza, 546 U.S. at 476–77.  Verizon moved for summary judgment on Underdog's claims of breach of contract and race discrimination on January 20, 2012.  The motion was fully submitted on February 22.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

I. Breach of Contract Claim

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011). For the purposes of this motion, Verizon does not dispute that the 2007 Agreement constituted a contract between it and the plaintiff,[3] nor does it contend that Underdog did not

---

[3] The 2007 Agreement purports to bind "Underdog Trucking LLC . . . and Verizon Services Corp., . . . on behalf of itself and for the benefit of its Affiliates . . . , each a Party and together the Parties hereto." The July 20 Opinion concluded

8

adequately perform its obligations under the Agreement. Rather, it argues that Underdog has failed to put forth evidence tending to show that the Verizon defendants breached a specific provision of the Agreement or that any damages flowed therefrom. Underdog, in contrast, identifies seven provisions of the 2007 Agreement that it claims were violated by Verizon.

The parties' disagreement in this regard stems not from any factual dispute but from their differing understandings of what the 2007 Agreement required. Whether the agreement was in fact breached is thus an issue of contract interpretation appropriate for resolution on summary judgment.

Under New York law, "the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (citation omitted). "Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement; and where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." Law Debenture Trust Co. of New York v. Maverick

---

that the Agreement's language created "at least an ambiguity" as to whether Verizon affiliates other than VSC are parties to the agreement. See July 20 Opinion, 2010 WL 2900048, at *4.

9

Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010). Contract language presents no ambiguity where it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (citation omitted). "[W]hether a written contract is ambiguous is a question of law for the court." Id.

In resisting summary judgment on its breach of contract claims, Underdog argues first that Verizon's use of BC for certain trucking jobs without first opening those jobs up for competitive bidding violated Paragraph 6.2 of the 2007 Agreement. Paragraph 6.2 provides, in relevant part:

> Payment and Billing -- Verizon agrees to pay Supplier as follows: . . . Verizon may submit an Order for Services at the fixed pricing set forth in Exhibit A. In addition, Verizon may solicit an offer or proposal to perform Services on a competitive bid or quotation basis, which if either is deemed acceptable to Verizon will be performed pursuant to a subsequently issued Order or Authorization Letter.

Underdog maintains that this provision "can only be understood to mean that if the defendant elected not to pay the agreed prices, then defendant had to submit the order to competitive bidding." In other words, "[t]he contract did not permit Defendant to issue shipping orders to [Underdog] competitors without submitting the orders to competitive bidding."

10

Underdog's interpretation of Paragraph 6.2 cannot be reconciled with that provision's express terms, nor is it supportable in light of the Agreement as a whole.  As noted, the language upon which Underdog relies appears under the heading "Payment and Billing."  Paragraph 6.2 and the other provisions that fall under that heading concern the means and manner in which Underdog is entitled to be compensated <u>once Verizon has hired it to perform a particular service</u>.  These provisions do not purport to address the process by which Verizon may allocate orders for services.  That issue is addressed by Paragraph 5 -- "Orders" -- which contains no reference to any limitations on Verizon's ability to assign trucking work to third-parties.  Underdog's proposed reading of Section 6.2 is further negated by Paragraph 4 of the Agreement, which states that the document's terms are intended to govern Verizon's purchase of services from Underdog "on a nonexclusive basis," and emphasizes that "[t]his is an as-ordered Agreement and does not itself order any Services."

This context leaves no ambiguity.  Section 6.2's use of the verb "may" ("Verizon <u>may</u> submit an Order" or "<u>may</u> solicit an offer or proposal") is plainly intended to be conditional and not, as Underdog suggests, permissive.  Section 6.2 describes circumstances that might give rise to various payment obligations by Verizon.  It does not specify (and therefore

limit) the means by which Verizon is authorized to offer trucking work to Underdog or third parties.  Accordingly, plaintiff's claim that Verizon breached Paragraph 6.2 by offering trucking jobs to BC Logistics without opening them up to bidding by Underdog fails.

Because the Agreement unambiguously allowed Verizon to assign work to shippers other than Underdog, it follows <u>a fortiori</u> that, contrary to plaintiff's claim, Verizon's practice, beginning in 2009, of assigning shipping jobs to Underdog only "in the very rare circumstances when BC was incapable of doing the work" was not an improper repudiation of the contract.  Nor did Verizon's use of BC Logistics violate the contract by "forcing [Underdog] to charge prices that were below those mandated by the contract."  As both parties acknowledge, Underdog was free to discount its rates below those provided in the Agreement; Verizon was likewise free to encourage such discounting by assigning deliveries to the shipper that offered the most competitive pricing.  For the same reasons, plaintiff's claim that Verizon violated the contract by "forcing Underdog to bid on work and not providing it complete information when it did" fails.  Put simply, nothing in the Agreement promised Underdog preferential or even equal treatment vis-à-vis competitors.

The other contract provisions upon which Underdog relies to support its breach of contract claim are similarly unavailing. Plaintiff maintains that the Agreement required Verizon to keep shipment records for a period of four years after termination of the Agreement and that Verizon's inability to produce certain bidding records during discovery suggests a violation of that requirement. But the provision in question, Paragraph 7.1 of the Agreement, imposes the record-keeping duty on the "Supplier," defined in Paragraph 1 of the Agreement as Underdog, not on Verizon.

Finally, Underdog argues that Verizon failed to comply with Paragraph 6.5 of the Agreement, which provides that "payments of undisputed amounts shall be made within sixty (60) days from the date of receipt of each invoice." Yet plaintiff has identified only one invoice, from May 8, 2009, that was not paid during the 60-day period and does not dispute that Verizon attempted to make payment with interest upon learning that the invoice was outstanding.

Thus, even viewed in the light most favorable to Underdog, the undisputed evidence shows that Verizon complied with the 2007 Agreement. Verizon is therefore entitled to judgment as a matter of law on Underdog's breach of contract claim.

II.  Section 1981 Claim

Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." Domino's Pizza, 546 U.S. at 474-75 (citing 42 U.S.C. § 1981(a)).  On a motion for summary judgment, claims under Section 1981 that rely on indirect evidence of discriminatory intent are analyzed under the familiar burden-shifting approach set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  See Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010).  Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  In a contract impairment case, the plaintiff must demonstrate (1) membership in a protected class; (2) that she was impaired by the defendant in the making or enforcing of a contract, and (3) circumstances surrounding that impairment giving rise to an inference of discrimination.  See Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000).

If the plaintiff satisfies this initial burden, "a presumption of discrimination arises, and the burden shifts to the defendant, who must proffer some legitimate nondiscriminatory reason for the adverse action." Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010).  If the defendant can offer such a reason, the presumption of discrimination

14

dissolves, and "the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Id. (citation omitted). The plaintiff may do so by showing that the defendant's reasons were pretextual or that the defendant's reasons "were not the only reasons and that the prohibited factor was at least one of the 'motivating factors.'" Holcomb, 521 F.3d at 138 (citation omitted). Although the burden of producing evidence may shift between the parties under this framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Leibowitz v. Cornell Univ., 584 F.3d 487, 499 (2d Cir. 2009) (citation omitted).

To the extent Underdog's Section 1981 claim rests on the defendant's purported interference with the 2007 Agreement, the claim fails at the first stage of the McDonnell-Douglas analysis. As discussed above, the Agreement established a framework that would govern future delivery contracts between Underdog and Verizon and did not itself commit Verizon to assign particular jobs to the plaintiff or prohibit Verizon from using other carriers. Thus, the conduct that Underdog cites in support of its claim that Verizon interfered with its right to enforce the 2007 Agreement -- the same conduct upon which it

15

relies for its breach of contract claim -- either does not bear on the Agreement or is not supported by the evidentiary record.[4]

But, Underdog also asserts that discriminatory motives prevented Verizon from contracting with it to perform individual delivery jobs. It is, of course, true that "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." Domino's Pizza, 546 U.S. at 476. Here too, however, Underdog has failed to carry its burden of establishing a prima facie case of race discrimination.

As noted, to establish a prima facie claim for contract impairment, a Section 1981 plaintiff must demonstrate (1) membership in a protected class; (2) that she was impaired by the defendant in the making or enforcing of a contract, and (3) circumstances surrounding that impairment giving rise to an inference of discrimination. Brown, 221 F. 3d at 339. For the purposes of this motion, it can be assumed that the race of Underdog's African-American owners may be imputed to the corporation, thereby satisfying the first prong of the test. It

---

[4] Specifically, Underdog argues that "[Verizon] employees interfered with [the 2007 Agreement] by failing to pay invoices, failing to allocate work, manufacturing a false claim that [Underdog] was overcharging [Verizon], engaging in sham bidding, failing to provide pertinent information to allow [Underdog] a fair chance at bidding, [and] withholding bid information."

is also assumed that a party's refusal to deal constitutes interference with the would-be counterparty's contractual rights in a way that is prohibited by Section 1981. Even on these assumptions, Underdog has failed to marshal any evidence that would suggest that Verizon's refusal to negotiate or to offer Underdog jobs on equal terms with other bidders was motivated by racial animus.

The only relevant piece of evidence that Underdog has identified in support of its assertion that Verizon's contracting decisions were racially motivated is Anders' testimony that, in May 2009, Aponte referred to the 2007 Agreement saying, "I don't care about your contract token nigger." In determining whether such isolated remarks give rise to an inference of discrimination, the Second Circuit has emphasized that "the more remote and oblique the remarks are in relation to the [defendant's] adverse action, the less they prove that the action was motivated by discrimination." <u>Tomassi v. Insignia Fin. Grp.</u>, 478 F.3d 111, 115 (2d Cir. 2007). Considered in light of this admonition, the remark attributed to Aponte is of little value in assessing what motivated Verizon to prefer the delivery services of BC Logistics over those of Underdog.

First, as defendant notes, Verizon began using BC Logistics for deliveries in March 2007, more than two-years before the

conversation between Anders and Aponte took place. The remark was thus fairly remote in time in relation to when the allegedly discriminatory conduct began. Second, the remark was made during a dispute over the rates that Underdog was entitled to charge for work already performed, not a discussion of Underdog's eligibility for future assignments. This difference in context reduces the probative value of the remark for assessing the conduct at issue. Finally, as the Tomassi Court recognized, "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." Id. Here, the decisions in question -- day-to-day determinations about which shippers to use for particular jobs -- were made by Matt Chappell or one of two independent contractors who also worked in the warehouse. Although plaintiff's brief suggests that Aponte "was the one who assigned work," this assertion is not supported by the record. Indeed, in its rule 56.1 Statement, plaintiff acknowledged Chappell's role in arranging jobs for Underdog and other shippers.

Even assuming that plaintiff could carry its burden of establishing a prima facie case of discrimination, its Section 1981 claim would still fail. Verizon has proffered a legitimate, nondiscriminatory reason for assigning work to BC

over Underdog -- namely that BC offered the same services at much lower rates.  In its brief, plaintiff questions whether BC's rates were in fact lower and whether the services provided by the two companies were comparable, but it has offered no evidence to support this speculation.  In contrast, Aponte's uncontradicted testimony was that on each of the three occasions in 2009 that BC and Underdog submitted competing bids for the same work, BC significantly underbid the plaintiff.  That testimony is supported by Verizon records reflecting that on at least one occasion BC submitted a bid that was more than $6,000 lower than the one submitted by Underdog.

Underdog tries weakly to rebut Verizon's proffered justification, asserting in passing that "cost was not an issue to [Verizon] and efficiency was the primary concern."  But it has submitted no evidence to support this claim.  Ultimately Underdog does not seriously contend that Verizon's claim to prefer BC for economic reasons was a mere pretext for discrimination, nor could it.  Given the savings to be had, Verizon cannot be blamed for assigning work to BC over Underdog.

CONCLUSION

The defendant's January 20 motion for summary judgment is granted. The Clerk of Court is directed to enter judgment for the defendant and close the case.

SO ORDERED:

Dated:   New York, New York
         June 26, 2012

                                    _____
                                        DENISE COTE
                                 United States District Judge